UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EVERETT PRINGLE,

Plaintiff,

v.

ANDREW WHEELER,

Defendant.

Case No. 19-cv-07432-WHO

**ORDER DENYING MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Re: Dkt. No. 28

Plaintiff Everett Pringle, an employee of the United States Environmental Protection Agency ("EPA"), claims that at various times between 2015 and 2020, he was discriminated against on the basis of race, subjected to a hostile work environment, and retaliated against for engaging in protected activities. Defendant Andrew Wheeler, Administrator of the EPA, moves to dismiss, arguing that Pringle failed to exhaust administrative remedies and failed to state a claim. I will deny that motion, taking Pringle's allegations as true, because: (i) his unexhausted allegations are like or reasonably related to the exhausted allegations in his administrative complaints; (ii) he has sufficiently pleaded a pattern of severe or pervasive conduct in support of his hostile work environment claim; and (iii) he has adequately alleged temporal proximity between his protected activities and the adverse employment actions, his supervisors' knowledge of his protected activities, and a pattern of discrimination and retaliation that makes the inference of causation plausible for his retaliation claim.

## BACKGROUND

### I.    FACTUAL BACKGORUND

Pringle is an African American male who has been employed as a Senior Environmental Protection Specialist at the EPA since June 2000. Second Amended Complaint ("SAC") [Dkt. No.

27] ¶ 12.  He has worked at the EPA Region 9 San Francisco office ("Region 9") for the entire duration of his employment.  *Id.* ¶ 13.  In or around May 2013, Roberto Rodriguez became his supervisor.  *Id.* ¶ 14.  Elizabeth Berg, the Assistant Director of the Enforcement Division, was his second-line supervisor and Amy Miller-Brown, the former Deputy Director of the Enforcement Division, was his third-line supervisor.  *Id.* ¶¶ 15–16.  Miller-Brown reported to Kathleen Johnson, the former Director of the Enforcement Division.  *Id.* ¶ 17.

### A.    2015 through 2016 Incidents and the June 23, 2016 Complaint

In early 2015, the Region 9 office made plans for a building renovation project.  SAC ¶ 18.  Employees who worked on floors that were being renovated were required to work from home or work on floors that were not currently being renovated for a two-week period.  *Id.*  Renovation on Pringle's floor was scheduled to start on May 20, 2015.  *Id.*

On April 17, 2015, Pringle was informed that all Enforcement Division personnel must have their workplaces packed up by 12:00 P.M. on May 19, 2015.  *Id.* ¶ 22.  Specifically, he was told to have his work area cleared, his work items and personal items packed in boxes, and his office furniture and cabinets tagged.  *Id.* ¶ 25.  Prior to the move, Rodriguez informed Pringle and his office colleagues that they could start teleworking prior to May 20, 2015 "as long as their red totes were packed and desk items (*i.e.*, chair, phone and monitor, etc.) were labeled."  *Id.* ¶ 28.

Pringle completed all of his preparations on or around May 12, 2015 and the next day, "Rodriguez came to [his] cubicle and congratulated him on having his red totes packed and cubicle cleaned for the move."  *Id.* ¶¶ 30–31.  Rodriguez also agreed that Pringle may start teleworking the day after the movers picked up his red totes, which they did on May 18, 2015.  *Id.* ¶¶ 33–34.

On May 19, 2015, when Pringle started working remotely, Miller-Brown informed him that he failed to properly pack up his workstation.  *Id.* ¶ 29.  Pringle responded that Rodriguez told him that he could start teleworking once his red totes were packed.  *Id.* ¶¶ 30–42.  Miller-Brown replied that "he would be charged with being Absent Without Leave ("AWOL") if he did not report to the office immediately."  *Id.* ¶ 47.  Pringle then called his union representative, Patrick Chan, and asked him to request a meeting with Miller-Brown to discuss the issue.  *Id.* ¶ 49.  When

2

United States District Court
Northern District of California

1    he arrived at the office, he "discovered that several of his colleagues in the Enforcement Division

2    who had failed to pack up their desks and adhere to the moving instructions had been asked to

3    finish packing up their desks." *Id.* ¶ 54.  None of these other Enforcement Division colleagues

4    were African American. *Id.* ¶ 55.

5         On June 2, 2015, Pringle sent an email to Miller-Brown to address the AWOL charge and

6    express that he felt he was being harassed on the basis of race because none of his colleagues who

7    had also failed to pack up their materials were disciplined in any way. *Id.* ¶¶ 56–57, 61.  A few

8    days later, on June 6, 2015, he was required to attend a pre-disciplinary meeting for allegedly

9    failing to timely pack up his materials. *Id.* ¶ 58.  On October 6, 2015, he was notified of a

10   proposed two-day suspension. *Id.* ¶ 60.

11        On October 19, 2015, Alexis Strauss, the Deputy Regional Administrator, discussed the

12   matter with Pringle and Chan. *Id.* ¶ 62.  Pringle again expressed that he felt he was being

13   disciplined based on his race. *Id.* ¶ 63.  On March 3, 2016, he was issued a final two-day

14   suspension and an AWOL decision; he served his two-day suspension from March 7 to March 8,

15   2016. *Id.* ¶¶ 64–65.

16        On June 23, 2016, he sent an administrative complaint to the United States Equal

17   Employment Opportunity Commission, Office of Federal Operations ("EEOC OFO"), alleging

18   that he was subject to a hostile work environment, disparate treatment based on his race, and

19   retaliation for protected activity, referring to his June 2, 2015 email articulating that he felt that he

20   was being disciplined based on race. *Id.* ¶ 66; Declaration of R. Renee Clark in Support of Motion

21   to Dismiss Second Amended Complaint ("Clark Decl.") [Dkt. No. 29-4], Ex. A (June 23, 2016

22   EEO Complaint).[1]  Approximately two years later, on June 12, 2018, the administrative judge

23   assigned to the case issued a decision by summary judgment in favor of the EPA.  SAC ¶ 67;

24   Clark Decl., Ex. D (June 12, 2018 Decision).

25   _____

26   [1] The documents attached to this declaration are appropriate for judicial notice, not of the
     assertions of fact within the documents, but of Pringle's own description of the discrimination
27   alleged in his administrative complaints, along with the description of others involved in the
     administrative proceedings. *See dela Cruz v. Brennan*, No. 19-CV-01140-DMR, 2020 WL
28   1233886, at *5 (N.D. Cal. Mar. 13, 2020) (taking judicial notice of certain official records from
     plaintiff's EEO proceedings pursuant to Federal Rule of Evidence 201).

Pringle appealed the decision on September 17, 2018.  SAC ¶ 68.  On August 7, 2019, the EEOC OFO issued an order affirming the EPA's final action and finding no discrimination with regards to Pringle's June 23, 2016 EEO Complaint.  Clark Decl., Ex. E (August 7, 2019 Decision).

### B.   2018 Incidents and the December 12, 2018 Complaint

Within days of filing his appeal to summary judgment for his prior EEO Complaint, Pringle was asked to attend another pre-disciplinary meeting on September 25, 2018.  SAC ¶ 69.  At that meeting, Rodriguez alleged that he failed to submit presentations on time, refused to conduct a dry run of a presentation, failed to show up to several meetings, failed to turn in inspection reports on time and failed to follow his supervisor's instructions.  *Id.* ¶¶ 70–71.  On October 11, 2018, Pringle was notified of a proposed ten-day suspension.  *Id.* ¶ 75.  He was issued a final nine-day suspension on November 27, 2018, which he served from November 29 to December 7, 2018.  *Id.* ¶¶ 87–88.

In another incident in October 2018, Region 9 announced a regional request for volunteers to support the Typhoon Yutu recovery mission in Saipan, Marina Islands.  *Id.* ¶ 77.  Even though Pringle was asked to join by the Manager of the Water Emergency Team ("WET") given his expertise, the Enforcement Division denied his request for permission to go on the emergency response mission.  *Id.* ¶¶ 79–80.  Instead, it approved the leave request of a different employee, Christina Carroll, to volunteer for the mission.  *Id.* ¶ 81.  Pringle alleges that she had the least experience in the Division and had no emergency response field experience.  *Id.*

Several days later, Pringle was informed that staff leadership again requested that the Enforcement Division management release him to support the Typhoon Yutu emergency because they needed experienced personnel in the field.  *Id.* ¶ 82.  He was eventually permitted to volunteer for the response mission in January 2019 after Carroll returned.  *Id.* ¶ 83.

On December 12, 2018. Pringle filed an administrative complaint with the EPA Office of Civil Rights ("OCR"), including the 2018 incidents described above as evidence of discrimination and retaliation.  *Id.* ¶ 87; Clark Decl., Ex. F (December 12, 2018 OCR Complaint).  On February 21, 2019, the EPA issued a notice of acceptance of claim to be investigated related to this OCR Complaint.  Clark Decl., Ex. G (February 21, 2019 Notice of Claims).

United States District Court
Northern District of California

### C.    2019 Incidents

On August 29, 2019, Pringle sent an email to Rodriguez at approximately 4:50 A.M. requesting leave for the workday of August 29, 2019 because his car had been broken into the night before.  SAC ¶ 89.  Rodriguez replied at approximately 10:42 A.M. directing Pringle to report to work, and that if he did not he would be charged with AWOL for 4.5 hours.  *Id.* ¶ 90.  In the same email, Rodriguez reprimanded him for not submitting his leave request at least 24 hours in advance.  *Id.* ¶ 92.

On the same day, Pringle sent an email to Berg, his second-line supervisor, informing her of his intention to report harassment by Rodriguez in accordance with EPA Order No. 4711, Procedure for Addressing Allegations of Workplace Harassment.  *Id.* ¶ 93.  On October 1, 2019, the EPA held a fact-finding meeting with Pringle to determine the facts of his harassment and retaliation claim filed under EPA Order No. 4711.  *Id.* ¶ 94.

### D.    2020 Incidents and the April 6, 2020 Informal Complaint

Pringle filed his initial complaint in this case on November 12, 2019, and a First Amended Complaint ("FAC") on January 29, 2020.  SAC ¶ 95.  Shortly after filing his FAC, the EPA again began arbitrarily denying his leave requests and designated him AWOL when he was not absent from work.  *Id.* ¶ 96.  Specifically, Pringle alleges that he requested leave three times, but did not take leave on any of the days because none of the requests were approved:

- On February 19, 2020, at approximately 3:48 P.M., he entered a leave request for February 20, 2020 for 3 hours of leave from 2 P.M. to 5 P.M.

- On March 2, 2020, at approximately 3:40 P.M., he entered a leave request for March 3, 2020 for 1 hour of leave from 4 P.M. to 5 P.M.

- On March 3, 2020, at approximately 4:01 P.M., he entered a leave request for March 6, 2020 for 8 hours of leave from 7:30 A.M. to 4 P.M.

*Id.* ¶¶ 99–102.  The EPA did not provide a basis for denying his leave requests.  *Id.* ¶ 103.  On February 20, 2020, he was listed as AWOL on the EPA's personnel management software.  *Id.*

On April 6, 2020, he filed an informal EEO complaint with the EPA recounting these allegations.  *Id.* ¶ 105; Clark Decl., Ex. H (April 6, 2020 informal EEO Complaint).  His attorney

United States District Court
Northern District of California

1    withdrew the informal complaint on April 23, 2020, one day after I granted the parties' stipulation

2    allowing Pringle to file a SAC to include these 2020 allegations.  Stipulation RE: Filing of Second

3    Amended Complaint [Dkt. No. 26]; Clark Decl., Ex. I.  The EPA confirmed withdrawal and

4    administratively closed the matter on the same day.  Clark Decl., Ex. J.

5    **II.    PROCEDURAL BACKGROUND**

6             Wheeler filed his motion to dismiss the SAC on May 8, 2020.  Defendant's Motion to

7    Dismiss Second Amended Complaint ("MTD") [Dkt. No. 28].  I heard oral argument on June 17,

8    2020.  At the hearing, the parties were ordered to provide supplemental case citations in support of

9    their arguments by June 22, 2020.

10                                      **LEGAL STANDARD**

11   **I.    MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

12            A motion to dismiss filed under Rule 12(b)(1) is a challenge to the court's subject matter

13   jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  "Federal courts are courts of limited jurisdiction," and

14   it is "presumed that a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins.*

15   *of Am.*, 511 U.S. 375, 377 (1994).  The party invoking the jurisdiction of the federal court bears

16   the burden of establishing that the court has the requisite subject matter jurisdiction to grant the

17   relief requested.  *Id.*

18            A challenge under Rule 12(b)(1) may be facial or factual.  *See White v. Lee*, 227 F.3d

19   1214, 1242 (9th Cir. 2000).  In a facial attack, the jurisdictional challenge is confined to the

20   allegations pleaded in the complaint.  *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).

21   The challenger asserts that the allegations in the complaint are insufficient "on their face" to

22   invoke federal jurisdiction.  *See Safe Air Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th

23   Cir. 2004).  To resolve this challenge, the court assumes that the allegations in the complaint are

24   true and draws all reasonable inference in favor of the party opposing dismissal.  *See Wolfe*, 392

25   F.3d at 362.

26            "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by

27   themselves, would otherwise invoke federal jurisdiction."  *Safe Air*, 373 F.3d at 1039.  To resolve

28   this challenge, the court "need not presume the truthfulness of the plaintiff's allegations."  *Id.*

(citation omitted). Instead, the court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.* (citations omitted). Once the moving party has made a factual challenge by offering affidavits or other evidence to dispute the allegations in the complaint, the party opposing the motion must "present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction." *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989); *see also Savage v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1040 n.2 (9th Cir. 2003).

## II.     MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss if a claim fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the claimant must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a claim must be supported by facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

## DISCUSSION

Wheeler moves to dismiss on the following four grounds: (i) failure to exhaust administrative remedies for certain claims; (ii) failure to allege any facts suggesting severe or pervasive harassment conduct for the hostile work environment claim; (iii) failure to allege a causal connection between a protected activity and the purportedly retaliatory conduct for the retaliation claim; and (iv) alternatively, failure to allege an adverse employment action under Title VII to the extent that any part of the retaliation and hostile work environment claims rely on pre-disciplinary meeting allegations.  I will discuss each in turn.

## I.     FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

To bring a Title VII claim in district court, a plaintiff must first exhaust her administrative

United States District Court
Northern District of California

remedies.  42 U.S.C. § 2000e-16(c); *Sommatino v. United States*, 255 F.3d 704, 707 (9th Cir. 2001).  Under the statutory and regulatory scheme, a federal employee must notify an EEO counselor of discriminatory conduct within forty-five days of the alleged conduct.  *Sommatino*, 255 F.3d at 708 (citing 29 C.F.R. §§ 1614.105, 1614.106).  The Supreme Court recently clarified that Title VII's claim-processing rules, while mandatory, are non-jurisdictional.  *Fort Bend Cty., Tex. v. Davis*, 139 S. Ct. 1843, 1851 (2019).  However, a plaintiff "must allege compliance with the [mandatory processing rule] . . . in order to state a claim on which relief may be granted." *Cloud v. Brennan*, No. 19-CV-04638-TSH, 2020 WL 533003, at *7 (N.D. Cal. Feb. 3, 2020) (citation omitted).

In order to meet the requirement of substantial compliance with administrative exhaustion, the allegations of a plaintiff's judicial complaint must be "like or reasonably related to the allegations" in an administrative complaint submitted to the EEOC, such that they would fall within "the scope of an EEOC investigation which [could] reasonably be expected to grow out of the [administrative] charge of discrimination."  *Cloud*, 2020 WL 533003, at *7 (quoting *Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir. 1990)); *see also Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 644 (9th Cir. 2003) (a court may consider "all claims of discrimination that fall within the scope of the EEOC's actual investigation or an EEOC investigation that could reasonably be expected to grow out of the charge").

Courts evaluating the similarity between an administrative complaint and a Title VII claim "may consider 'such factors as the alleged basis of the discrimination, dates of discriminatory acts specified within the charge, perpetrators of discrimination named in the charge, and any locations at which discrimination is alleged to have occurred.'"  *Vasquez*, 349 F.3d at 644 (quoting *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1100 (9th Cir. 2002)).  "In addition, the court should consider plaintiff's civil claims to be reasonably related to allegations in the charge to the extent that those claims are consistent with the plaintiff's original theory of the case."  *B.K.B.*, 276 F.3d at 1100. "Procedural technicalities should not be employed to impede a Title VII claimant from obtaining a judicial hearing on the merits."  *Ramirez v. Nat'l Distillers & Chem. Corp.*, 586 F.2d 1315, 1321 (9th Cir. 1978) (citation omitted).

### A.      Claims Related to the 2019 Incidents

Wheeler argues that Pringle should not be allowed to exhaust his 2019 leave denial allegations through his June 23, 2016 EEO Complaint because that administrative action, which ended on August 7, 2019, was no longer pending when the events purportedly occurred.  MTD 12.

Ninth Circuit precedent provides that "even facts occurring *after* the administrative agency has completed its investigation can fall within the scope of an earlier administrative complaint so long as they are sufficiently similar to the claims raised therein."  *Williams v. Wolf*, No. 19-CV-00652-JCS, 2019 WL 6311381, at *8 (N.D. Cal. Nov. 25, 2019) (emphasis added); *see also id.* at *7 ("*Vasquez*, which was not an en banc decision, cannot overrule *Sosa*'s holding that even subsequent incidents that the 'EEOC could not have investigated' can be sufficiently related to an earlier administrative complaint to satisfy the exhaustion requirement.").[2]

For example, in *Williams*, plaintiff sued her employer for discrimination and retaliation in the course of her employment as a paralegal.  2019 WL 6311381, at *1.  Defendants sought dismissal of the allegation that her supervisor notified her in June 2019 that she was being investigated for neglecting her duties and failing to follow instructions.  *Id.* at *7.  They argued that "none of the agency's EEO investigations could have encompassed this claim because it had not yet occurred by the conclusion of each investigation."  *Id.*  The court rejected that argument, finding that plaintiff's 2017 and 2018 administrative complaints alleged that the same supervisor previously subjected her to a series of purported adverse actions, including similar criticism of her job performance.  *Id.* at *8.  Although the 2019 allegation regarding job performance was not properly exhausted, the court denied dismissal of it because the claim was "consistent with the plaintiff's original theory of the case."  *Id.* (quoting *B.K.B.*, 276 F.3d at 1100).

---

[2] At the hearing, I asked the parties to provide supplemental authority on the exhaustion issue. Wheeler provides multiple case citations from the Eastern District of Pennsylvania which have held that allegations that occur after an EEO investigation is completed cannot satisfy the "like or reasonably related" doctrine.  Defendant's Notice of Supplemental Authorities in Support of Motion to Dismiss Second Amended Complaint [Dkt. No. 38]; *see Crumpton v. Potter*, 305 F. Supp. 2d 465, 476 (E.D. Pa. 2004); *Whearry v. Norton*, No. CIV. A. 05-2426, 2008 WL 2265273, at *3 (E.D. Pa. Jun. 2, 2008); *Zaengle v. Rosemount, Inc.*, No. CIV.A. 08-2010, 2014 WL 296938, at *3 (E.D. Pa. Jan. 28, 2014).  These case citations are unpersuasive because they are inconsistent with the Ninth Circuit case law discussed above.

Similarly, here, the 2019 allegations are consistent with Pringle's original theory of the case because it involves the same actors and similar conduct. His original June 23, 2016 EEO Complaint, which parties agree has been properly exhausted, included claims stemming from "disparate treatment regarding leave procedures." Clark Decl., Ex. A at 2. In explaining why he thought he was being discriminated against, Pringle wrote: "Management has treated me with disparate treatment regarding leave procedures and have fabricated situations, scenarios and circumstances in order to support the assertions of their charges and personnel actions against me." *Id.* He also referenced disparate treatment regarding leave procedures and specifically named Rodriguez in his supplemental affidavit. *See* Clark Decl., Ex. C at 4, 5 (stating that one of the reasons management issued the proposed two-day suspension on October 6, 2015 was because he was "absent without leave"; he disputed this cited reason because Rodriguez gave him "permission to work from home" on May 19, 2015, but he was nonetheless charged as AWOL).

In August 29, 2019, he similarly asked Rodriguez for leave given a car break-in incident. Rodriguez arbitrarily denied his request, told him that a failure to report to work would lead to an AWOL charge, and reprimanded him for not submitting his request at least 24 hours in advance. SAC ¶¶ 89–92. These 2019 leave denial allegations are "like or reasonably related" to his June 23, 3016 EEO Complaint.

Wheeler argues that this interpretation of the "like or reasonably related" doctrine is too broad, and would allow Pringle to pursue claims for leave denials that occurred more than three years after his June 23, 2016 EEO Complaint. Defendant's Reply in Support of Motion to Dismiss Second Amended Complaint ("Reply") [Dkt. No. 34] 4. But the dates of discriminatory acts specified within the charge are just one of the factors I must weigh here. The perpetrators of discrimination named in the charge are the same and the claims are consistent with Pringle's original theory of the case. On balance, this shows that there is substantial similarity between his administrative complaint and his Title VII claims.

Wheeler's motion to dismiss the 2019 allegations for failure to exhaust administrative remedies is DENIED.

**B.      Claims Related to the 2020 Incidents**

Pringle alleges that the pattern of arbitrary leave denials continued when he requested leave three times between February and March 2020. SAC ¶ 96–101. His supervisors arbitrarily denied each request without providing a basis and instead designated him as AWOL when he was present at work. *Id.* ¶ 102–104. For the same reasons stated above as to the 2019 allegations, these 2020 allegations are also reasonably related to the "disparate treatment regarding leave procedures" he complained of in his exhausted June 23, 2016 EEO Complaint. Clark Decl., Ex. A at 2. Wheeler's motion to dismiss the 2020 allegations for failure to exhaust administrative remedies is DENIED.[3]

**C.      Retaliation Claims Related to Incidents Before June 23, 2016 EEO Complaint**

Before filing his June 23, 2016 EEO Complaint, Pringle alleges that he engaged in protected activity when he: (i) reported that he felt he was being harassed on the basis of race in a June 2, 2015 email to Miller-Brown (SAC ¶¶ 56–57); and (ii) told Strauss in a meeting on October 19, 2015 that he felt he was being disciplined based on his race (*Id.* ¶¶ 62–63). Wheeler argues that Pringle has failed to exhaust any retaliation claim related to these purported protected activities because both the June 23, 2016 EEO Complaint and the administrative record did not raise these particular retaliation claims. MTD 14.

It is not dispositive that the June 23, 2016 EEO Complaint only specified discrimination and hostile work environment claims, and not retaliation. A court may adjudicate a retaliation claim "like or reasonably related to" the allegations in the administrative complaint. *See Zapponi v. CSK Auto, Inc.*, No. C02-0536 TEH, 2002 WL 31750219, at *4 (N.D. Cal. Dec. 4, 2002).

In *Zapponi*, plaintiff's administrative complaint indicated that "she was harassed, forced to quit, denied promotion, denied equal pay, and discriminated against on the basis of sex." *Id.* Defendant moved for summary judgment on the retaliation claim she brought in federal court on grounds that she did not properly exhaust the claim that defendant retaliated against her for

United States District Court
Northern District of California

---

[3] Wheeler also argues that the 2020 leave denial allegations should be dismissed because Pringle voluntarily abandoned these claims when he withdrew his April 6, 2020 informal EEO Complaint. MTD 11. Regardless, these claims are still reasonably related to the exhausted claims, and therefore not subject to dismissal for failure to exhaust administrative remedies.

complaining about discrimination and harassment.  *Id.*  But the court was unpersuaded:  "Given the relationship between the retaliation claim and other allegations, it [was] reasonable to assume that an investigation into the harassment and discrimination claims would alert Defendant to Plaintiff's allegation that she was denied a promotion in retaliation for speaking out about Defendant's unlawful conduct."  *Id.* at *5; *see also Wells v. Regents of the Univ. of California*, No. 15-CV-01700-SI, 2015 WL 6746820, at *3–4 (N.D. Cal. Nov. 5, 2015) (plaintiffs "raised claims of retaliation that are 'like or reasonably related to the charge' of discrimination" filed in their administrative complaints and "so need not have exhausted their retaliation claims"); *Ibok v. Advanced Micro Devices, Inc.*, No. 5:02-CV-01485 JW, 2003 WL 25686529, at *2 (N.D. Cal. Jul. 2, 2003) ("reasonable to assume that an investigation into Ibok's administrative complaint for race and national origin discrimination would have led to the bases of Ibok's retaliation claim" because discrimination allegations in the administrative complaint were "reasonably related" to bases for retaliation claim brought in federal suit); *James v. Tempur Sealy Int'l, Inc.*, No. 18-CV-07130-SI, 2019 WL 176340, at *6 (N.D. Cal. Jan. 11, 2019) (allowing leave to amend because it is "possible that even if plaintiff did not use the word 'retaliation' in his [administrative] complaint, he may still have exhausted his claim").

The same reasoning applies here.  Although Pringle did not explicitly allege a retaliation claim in his June 23, 2016 EEOC Complaint, it is reasonable to assume that an investigation into that administrative complaint for race discrimination would have led to the basis of his retaliation claim.  In his administrative complaint, he alleged that he was subjected to a hostile work environment, harassment, and disparate treatment based on race and/or national origin when management issued a proposed two-day suspension letter on October 6, 2015 and a final two-day suspension decision on March 3, 2016.  *See* Clark Decl., Exs. A, B.

In the EEO Investigative Affidavit questionnaire attached to his EEO Complaint, he described the situation that led up to his two-day suspension.  *See id.*, Ex. C.  He was issued a proposed two-day suspension because he was allegedly AWOL on May 19, 2015, lacked candor, and failed to follow instructions by not properly packing up his office.  *Id.*, Ex. C at 4.  He argued that management's racial biases and discrimination towards him was manifested in their proposed

two-day suspension notice because five other employees who were not African American also failed to properly pack up their offices, yet he was the only one who was reprimanded.  *Id.*, Ex. C at 7.

Similar factual allegations form the basis of the retaliation claim he brings in the SAC.  He sent an email to Miller-Brown on June 2, 2015 to address the May 19, 2015 AWOL charge, explaining that he felt he was being harassed on the basis of race because he obtained permission to telework that day.  SAC ¶¶ 47–57.  A few days later, he was told to attend a pre-disciplinary meeting to address his failure to pack up on May 19, 2015.  *Id.* ¶¶ 58–59.  That meeting eventually led to a proposed two-day suspension on top of the AWOL charge.  *Id.* ¶ 60.  In response, he again complained to Strauss in a October 19, 2015 meeting that he felt he was being disciplined based on his race because none of his colleagues who also failed to pack up their materials were disciplined in any way.  *Id.* ¶¶ 61–63.  He was issued a final two-day suspension on March 3, 2016.  *Id.* ¶ 64.  Like *Zapponi*, *Wells*, and *Ibok*, the discrimination claim in Pringle's administrative complaint is "reasonably related" to the basis for the retaliation claim brought in the SAC.

Contrary to Wheeler's argument, it is also not dispositive that he answered "N/A" to questions in the EEO Investigative Affidavit questionnaire specifically geared towards retaliation.  Clark Decl., Ex. C at 3, 8, 11.  "Because typical complaints are filled out by non-attorneys, courts construe the EEOC charge with 'utmost liberality,' and it is sufficient that the EEOC is apprised of the alleged discriminatory parties and the alleged discriminatory acts."  *Ng v. Potter*, No. C09-192Z, 2009 WL 3836045, at *2 (W.D. Wash. Nov. 12, 2009) (citing *Leong v. Potter*, 347 F.3d 1117, 1122 (9th Cir. 2003)); *Love v. Pullman Co.*, 404 U.S. 522, 527 (1972) ("[T]echnicalities are particularly inappropriate in a statutory scheme [such as Title VII] in which laymen, unassisted by trained lawyers, initiate the process.").  Notably, Pringle referenced the alleged protected activity (namely the June 2, 2015 email) in his answers to a number of other questions, including:

- "Q43: Did you complain to any EPA management officials about allegedly being subjected to harassment?"; he answered "June 2, 2015 –  Email to management on their treatment of me based on erroneous and unreasonable charges of misconduct."  Clark

1    Decl., Ex. C at 12.

2    • "Q44: With regard to each incident of alleged harassment/hostile work environment you

3    raised, did you or anyone on your behalf notify EPA management officials of the alleged

4    harassment towards you prior to entering the EEO complaint process?"; he answered "June

5    2, 2015 – Email to management on their treatment of me based on erroneous and

6    unreasonable charges of misconduct." *Id.*, Ex. C at 12–13.

7    These references make it reasonable to assume that an investigation into Pringle's administrative

8    complaint for race discrimination could have led to the basis of his retaliation claim as it relates to

9    the alleged protected activities he engaged in prior to filing the June 23, 2016 EEO Complaint.

10    Wheeler's motion to dismiss this portion of the retaliation claim for failure to exhaust

11    administrative remedies is DENIED.

12    **II.    FAILURE TO STATE A CLAIM**

13    **A.    Hostile Work Environment**

14    To state a claim for hostile work environment, a plaintiff must allege that (1) he was

15    subjected to unwelcome verbal or physical conduct because of his race, and (2) that the conduct

16    was sufficiently severe or pervasive to alter the conditions of his employment and create an

17    abusive work environment. *Manatt v. Bank of America*, 339 F.3d 792, 798 (9th Cir.

18    2003); *Vasquez*, 349 F.3d at 642. Wheeler contends that Pringle's hostile work environment

19    allegations fall short of asserting "severe or pervasive" harassing conduct. MTD. 21.

20    To determine whether conduct was sufficiently severe or pervasive to violate Title VII,

21    courts look at the totality of the circumstances. *Harris v. Forklift Sys., Inc.*, 510 U.S.

22    17, 23 (1993). Occasional or isolated incidents are not actionable; rather, a plaintiff must show a

23    concerted pattern of harassment of a repeated, routine, or generalized nature. *Faragher v. City of

24    Boca Raton*, 524 U.S. 775, 788 (1998); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 (9th

25    Cir. 2004); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994).

26    In addition, "[t]he working environment must both subjectively and objectively be

27    perceived as abusive." *Vasquez*, 349 F.3d at 642 (quoting *Brooks v. City of San Mateo*, 229 F.3d

28    917, 923 (9th Cir. 2000)). Subjectively, the evidence must show that the harassment is sufficiently

severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *McGinest*, 360 F.3d at 1113. The Supreme Court has followed a "middle path" with regard to the level of hostility or abuse necessary to establish a hostile work environment. *McGinest*, 360 F.3d at 1113 (citing *Harris*, 510 U.S. at 21). "It is enough 'if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position.'" *Id.* (quoting *Steiner*, 25 F.3d at 1463).

Objectively, courts looks at "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *McGinest*, 360 F.3d at 1113. The analysis is made from the perspective of a reasonable person belonging to the same racial or ethnic group as the plaintiff. *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007) (citing *Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1527 (9th Cir. 1995)). The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct. *Harris*, 510 U.S. at 23; *McGinest*, 360 F.3d at 1113.

Pringle sufficiently alleges a pattern of discriminatory and retaliatory harassment spanning over at least five years that unreasonably affected a term, condition or privilege of his employment. SAC ¶ 130. He claims that he was unduly subjected to pre-disciplinary meetings and issued suspensions on at least two occasions, repeatedly designated as AWOL when he was not absent from work, given unwarranted negative performance reviews, and continuously had his leave requests arbitrarily denied, including being denied the opportunity to volunteer for a project within his expertise, some of which were plausibly in retaliation of his multiple complaints. *Id.* ¶ 128.

These allegations are enough to plead a hostile work environment that "mak[es] it more difficult for [Pringle] to do [his] job, to take pride in [his] work, and to desire to stay on in [his] position." *Steiner*, 25 F.3d at 1463. Under the totality of circumstances, it is plausible that a reasonable person of his racial or ethnic background would perceive this as an intolerable working

environment, particularly when "[t]he EPA did not subject other, non-African American employees to harassment or discipline." SAC ¶ 112. He points to at least two cases in which courts found similar allegations were sufficient to state a hostile work environment claim. *See* Plaintiff's Notice of Supplemental Authority [Dkt. No. 37].[4]

Wheeler's arguments are unconvincing. His contention that these acts should be analyzed as independent incidents runs counter to the concept of a hostile work *environment* and is inconsistent with the holistic approach endorsed by the Ninth Circuit and the Supreme Court, which instructs courts to consider hostile work environments "in light of all of the circumstances." *McGinest*, 360 F.3d at 1112–13; *see, e.g.*, *Vazquez v. Wolf*, No. 18-CV-07012-JCS, 2020 WL 3268668, at *8 (N.D. Cal. Jun. 17, 2020) (denying motion to dismiss because allegations of several events spanning over more than a year, taken together, sufficiently alleged "an environment that a reasonable person would find hostile or abusive").

Wheeler further argues that Pringle's hostile work environment allegations pale in comparison to the types of conduct that the Ninth Circuit has found do not amount to a hostile work environment. MTD 23. But those cases, which he summarily cites without comparing them to the facts alleged in this case, are distinguishable. For example, in *Manatt*, the Ninth Circuit

---

[4] In *Tefera v. City Ctr. Parking*, No. CIV. 07-1413-ST, 2009 WL 1107704, at *16 (D. Or. Apr. 22, 2009), plaintiff alleged that his supervisor "discounted [his] ideas while praising similar ideas put forward by Caucasian employees, made him beg for vacation leave, continuously put off his requests for vacation leave and granted him leave on conditions less favorable than those given to Caucasian employees, 'brushed off' frequent complaints by him and other supervisors about [another employee's] discriminatory and abusive treatment of employees, and transferred his employees to underperforming Caucasian supervisors, one of whom was given a promotion [plaintiff] desired." The court noted that none of the supervisor's actions by itself was particularly severe and none as egregious as conduct deemed insufficient in other cases within the Tenth Circuit, but nonetheless denied summary judgment because "a jury could conclude that a reasonable black African would find [the supervisor's] conduct to be sufficiently pervasive to render the work environment hostile based on race or national origin." *Id.*

In *Macieyovski v. City & Cty. of Denver, Dep't of Gen. Servs.*, No. 13-CV-01186-WYD-BNB, 2015 WL 1509503, at *4 (D. Colo. Mar. 30, 2015), plaintiff alleged that his hostile work environment claim "[arose] out of attacks that went to the very essence of his job," including "claims that his performance was inadequate, that he was a danger to the public, that he failed to show up for work during a snow emergency, and disciplinary suspension from work." *Id.* He also alleged that he was micromanaged, denied vacation, and had time taken off his clock. *Id.*. The court denied summary judgment because there were "genuine issues of material fact as to whether Plaintiff was forced to work in a hostile work environment." *Id.*

1    found that "two regrettable incidents occurring over a span of two-and-a-half years, coupled with

2    the other offhand remarks made by Manatt's co-workers and supervisor, did not alter the

3    conditions of Manatt's employment."  339 F.3d at 799.  Unlike a few offhand comments, Pringle

4    sufficiently alleges a pattern of severe or pervasive conduct.

5    Wheeler asserts that Pringle has not alleged that he was ever subjected to the kind of

6    egregious or humiliating conduct that courts have found create a hostile work environment.  Reply

7    10.  But in *Harris* the Court emphasized that "Title VII comes into play before the harassing

8    conduct leads to a nervous breakdown" because "[a] discriminatorily abusive work environment,

9    even one that does not seriously affect employees' psychological well-being, can and often will

10   detract from employees' job performance, discourage employees from remaining on the job, or

11   keep them from advancing in their careers."  *Harris*, 510 U.S. at 22.  It found that the "appalling

12   conduct alleged in *Meritor*, and the reference in that case to environments 'so heavily polluted

13   with discrimination as to destroy completely the emotional and psychological stability of minority

14   group workers,' . . . merely present[ed] some especially egregious examples of harassment."  *Id.*

15   (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).  It warned that such

16   examples "do not mark the boundary of what is actionable."  *Id.*[5]  "[W]hether an environment is

17   'hostile' or 'abusive' can be determined only by looking at all the circumstances" and "is not, and

18   by its nature cannot be, a mathematically precise test."  *Id.* at 22–23; *see Gates v. Bd. of Educ. of*

19   *the City of Chicago*, 916 F.3d 631, 637 (7th Cir. 2019) (a hostile work environment standard that

20   "must reach the point of 'hellishness' before becoming actionable is impossible to reconcile with

21   *Harris v. Forklift Systems, Inc.*").

22   While macroaggressions undoubtedly constitute a hostile work environment, pervasive

23

24   ─────────────────────────

25   [5] Pringle attached the EEO Counselor's Report as an exhibit to his opposition, in which he
     reported that he felt that that management "constantly [thought] he's lying" and that he felt like he
26   was being "emotionally abused, that he gets depressed and has to call out sick, and that his work
     suffers as a result."  Plaintiff's Opposition to Defendant's Motion to Dismiss ("Oppo.") [Dkt. No.
27   32] 16.  Although the EEO Counselor's Report is not directly quoted in the SAC, reading the SAC
     in the light most favorable to Pringle, I am satisfied that he has described "an environment that a
28   reasonable person would find hostile or abusive," *Harris*, 510 U.S. at 21, and that could fairly be
     characterized as "a change in the terms and conditions of employment," *Faragher*, 524 U.S. at
     788.

microaggressions have the ability to diminish the workplace significantly as well.  Put differently, a severe episode that occurs as rarely as once violates Title VII, and so does a relentless pattern of lesser harassment that extends over a long period of time.  *See McGinest*, 360 F.3d at 1113 ("The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct.") (citation omitted).

Contrary to Wheeler's oversimplification, that Pringle did not allege "hellish" behavior does not make his hostile work environment claim implausible.  Allegations that (when taken together) assert a pattern of lesser harassments is sufficient.  *See, e.g.*, *Landucci v. State Farm Ins. Co.*, 65 F. Supp. 3d 694, 704 (N.D. Cal. 2014) (hostile work environment claim plausibly alleged where plaintiff alleged that her supervisor commented on her choice of clothing several times while not commenting on the clothing of male employees, and treated her completely differently than her male co-workers by consistently and excessively micromanaging her every step and criticizing her work nonstop); *Rico v. Jones Lang LaSalle Americas, Inc.*, No. CV 14-1322-GHK JEMX, 2014 WL 1512190, at *2–3 (C.D. Cal. Apr. 16, 2014) (allegations of negative performance reviews, criticism, and demeaning comments related to her pregnancy "taken together, suggest at least a possibility that Patterson engaged in a pattern of harassing conduct toward [p]laintiff based on her pregnancy" and thus were "sufficiently severe" to plausibly allege a harassment claim based on pregnancy).

To the extent that Wheeler factually challenges the severity or pervasiveness of Pringle's allegations, this argument is not appropriate at the pleadings stage.  *See Brown v. Contra Costa Cty.*, No. C 12-1923 PJH, 2014 WL 1347680, at *7 (N.D. Cal. Apr. 3, 2014) (denying 12(b)(6) motion to dismiss because "[t]he determination of whether racially motivated conduct is severe and pervasive and whether a work environment is sufficiently abusive raises questions that are best evaluated in light of an evidentiary record").  Wheeler's motion to dismiss the hostile work environment claim is DENIED.

## B.    Retaliation

To state a claim for retaliation under Title VII, a plaintiff must demonstrate that: "(1) the employee engaged in a protected activity, (2) she suffered an adverse employment action, and (3)

1   there was a causal link between the protected activity and the adverse employment decision."

2   *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1093-94 (9th Cir. 2008). Wheeler moves to dismiss

3   Pringle's retaliation claim for failure to plausibly allege a causal connection between the alleged

4   protected activities and adverse employment decisions.  MTD 15–21.

5                    **1.      Causation**

6           Because it is often difficult for plaintiffs to adduce direct evidence of retaliation, causation

7   between protected activity and adverse employment action may be "inferred from circumstantial

8   evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and

9   the proximity in time between the protected action and the allegedly retaliatory employment

10  decision."  *Hoko v. Transit Am. Servs.*, No. 14-CV-01327-LHK, 2014 WL 3963033, at *8 (N.D.

11  Cal. Aug. 13, 2014) (quoting *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)).  "If a

12  plaintiff relies solely on the proximity in time inference to support the causation prong, that

13  proximity in time must be very close."  *Williams v. Tucson Unified Sch. Dist.*, 316 F. App'x 563,

14  564 (9th Cir. 2008).

15          Pringle alleges that he engaged in protected activity when he reported that he believed that

16  he was being harassed on the basis of race in his June 2, 2015 email to Miller-Brown and in his

17  October 19, 2015 meeting with Strauss as well as when he filed complaints with the EEOC on

18  June 23, 2016 and December 12, 2018.  SAC ¶ 119.[6]  He contends that the EPA retaliated against

19  him for engaging in these protected activities "when it subjected him to pre-disciplinary hearings,

20  when it issued him a 2-day suspension, when it charged him with AWOL, when it issued him a 9-

21  day suspension, when it denied his request to volunteer for the Typhoon Yutu response mission,

22  when it denied his leave request following the break-in incident, and when it arbitrarily denied his

23  leave requests and designated him as AWOL even though he was not absent from work."  *Id.* ¶

24  120.

25

26  _____

27  [6] Although he pleads facts about the filing of the December 18, 2018 OCR Complaint in the SAC
    and refers to it as a protected activity in his opposition brief, paragraph 119 of the SAC only refers
    to it as a protected activity in his opposition brief, paragraph 119 of the SAC only refers
    to filing of the June 23, 2016 Complaint as a protected activity.  SAC ¶ 119.  It appears that he

28  inadvertently omitted the filing of his OCR Complaint in the list of protected activities provided in
    paragraph 119 of the SAC.

United States District Court
Northern District of California

### a.    June 2, 2015 and October 19, 2015 Informal Reports

Wheeler argues that there is no retaliatory causation established between the June 2, 2015 email and the June 6, 2015 pre-disciplinary meeting because the June 6, 2015 pre-disciplinary meeting had been put in motion before Pringle purportedly engaged in protected activity on June 2, 2015.  MTD 17; SAC ¶¶ 56–57, 119–20.  This factual challenge goes to the merits of Pringle's causation allegations and is beyond the scope of a motion to dismiss.  Whether the pre-disciplinary meeting was already in motion is an inquiry that is more appropriate after parties have the opportunity to conduct discovery.  At this stage, looking at the SAC in light most favorable to Pringle, causation is plausibly pleaded given the close temporal proximity between the June 2, 2015 email and June 6, 2015 pre-disciplinary meeting.  *See Tucson Unified Sch. Dist.*, 316 F. App'x at 564 (temporal proximity must be very close when relying on temporal proximity alone to establish causation).

Wheeler contends that the October 19, 2015 report to Strauss could not have caused the prior June 6, 2015 pre-disciplinary meeting.  MTD 18–19.  Even though the October 19, 2015 informal report could not have caused previous adverse actions, Wheeler's argument ignores the possibility that the informal report may have influenced the final outcome of the March 3, 2016 disciplinary decision.  While Pringle was informed about a proposed two-day suspension prior to the October 19, 2015 report to Strauss, it was not until March 3, 2016 that he was issued a final two-day suspension and an AWOL decision letter from Strauss.  SAC ¶ 64.  The approximate five months between October 19, 2015 and March 3, 2016 make a causal connection plausible.  *See Brown v. Potter*, 457 Fed. Appx. 668, 673 (9th Cir. Nov. 3, 2011) (five months in between filing of second amended complaint and when plaintiff was discharged "[did] not follow directly on each other's heels, but are closely enough linked to suggest a causal connection").[7]

In addition to temporal proximity between the June 2, 2015 email and June 6, 2015 pre-

---

[7] Wheeler cites to other cases in which the Ninth Circuit has found five months too long to support an inference of causation.  *See, e.g.*, *Garcia v. City of Everett*, 728 F. App'x 624, 628 (9th Cir. 2018).  But the Ninth Circuit has cautioned against engaging in "a mechanical inquiry into the amount of time between the [protected activity] and the alleged retaliatory action" and has rejected the application of any "bright-line rule providing that a certain period of time is per se too long to support an inference or retaliation."  *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 751 (9th Cir. 2010).

disciplinary meeting and between the October 19, 2015 meeting and the March 3, 2016 final

decision, Pringle's allegations also plausibly suggest that his supervisors had actual knowledge of

his protected activities.  Miller-Brown received the June 2, 2015 email and also attended the pre-

disciplinary meeting on June 6, 2015.  SAC ¶¶ 56–58.  Strauss discussed Pringle's harassment

concerns at the October 19, 2015 meeting, and also issued the final two-day suspension and

AWOL decision on March 3, 2016.  *Id.* ¶¶ 62–64.

Pringle has plausibly alleged a causal connection between his informal reports of racial

discrimination and subsequent adverse employment actions.

### b.    June 23, 2016 and December 12, 2018 Complaints

Wheeler argues that the filing of the EEO Complaint on June 23, 2016 is not close enough

to any of the allegedly adverse employment actions in late 2018 to support an inference of

causation.  MTD 20.  Pringle points out that he faced adverse employment actions within days of

actively pursuing his claim in the EEOC process.  On September 17, 2018, he filed an appeal to

summary judgment.  SAC ¶¶ 67, 87.  Two days later on September 19, 2018, he received an email

from his supervisor requesting the September 25, 2019 pre-disciplinary meeting to discuss his

negative performance review.  *Id.* ¶¶ 71, 87.  Following the pre-disciplinary meeting, he was

issued a proposed ten-day suspension on October 11, 2018 and a final nine-day suspension on

November 27, 2018.  *Id.* ¶¶ 75, 86.  Also in October 2018, his request to volunteer for the

Typhoon Yutu response efforts was denied, although he eventually received permission to go in

January 2019 after the WET team said they "desperately needed experience personnel in the

field."  *Id.* ¶¶ 77–82.

Wheeler cites to a Third Circuit case to argue that courts "typically measure temporal

proximity from the date of filing . . . since the 'protected activity' in which a litigant engages is the

filing of a complaint."  MTD 20 (quoting *Gladysiewski v. Allegheny Energy*, 398 Fed. Appx. 721,

724 (3d Cir. 2010) (citation omitted)).  The Ninth Circuit, however, has recognized that protected

activity includes "engaging in other activity intended to oppose an employer's discriminatory

practices."  *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003)

("Protected activity includes the filing of a charge or a complaint, or providing testimony

United States District Court
Northern District of California

1    regarding an employer's alleged unlawful practices, as well as engaging in other activity intended

2    to oppose an employer's discriminatory practices.") (internal quotation marks and citation

3    omitted).  The temporal proximity between Pringle's filing of appeal and the negative performance

4    review, suspension, and denial of permission to participate in the Typhoon Yutu project supports

5    an inference of causation.  *See Johnson v. Alameda–Contra Costa Transit Dep't*, 2006 WL

6    2587293 at *7 (N.D. Cal. Sept. 8, 2006) (temporal proximity of three to four months supports

7    inference of retaliation)

8         Wheeler also contends that the December 12, 2018 OCR Complaint is not close enough to

9    any of the alleged leave denials that occurred at least eight months later in in 2019 or 2020 to

10   support an inference of causation.  MTD 21.  Pringle responds that these retaliatory actions must

11   be viewed in a different lens than the earlier alleged retaliatory actions because, by 2019 and 2020,

12   a pattern of discriminatory and retaliatory activity by the EPA had been established over the last

13   five years.

14        While "a lack of temporal proximity may make it more difficult to show causation,

15   circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give

16   rise to the inference."  *Castillo v. Dominguez*, 120 Fed. App'x. 54, 57 (9th Cir.2005) (quoting

17   *Porter v. California Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005)); *see Adetuyi v. City & Cty.*

18   *of San Francisco*, 63 F. Supp. 3d 1073, 1090 (N.D. Cal. 2014) ("[A] pattern of ongoing retaliation

19   following protected conduct supports a finding of causation.") (citing *Wood v. Dollar Rent-A-Car*

20   *Sys., Inc.*, 128 F. App'x 620, 622 (9th Cir. 2005)); *Ray v. Henderson*, 217 F.3d 1234, 1245 (9th

21   Cir. 2000) (a hostile work environment may be the basis for a retaliation claim under Title VII).

22        As discussed above, Pringle plausibly alleges a pattern of discriminatory and retaliatory

23   activity over the last five years during which he made multiple complaints of discrimination and

24   retaliation and which created a hostile work environment.  *See supra* Section II.A.  Based on these

25   allegations, it is plausible that leave denials in 2019 and 2020 stemmed from his protected conduct

26   in filing his December 12, 2018 EEOC OCR Complaint, even though it was at least eight months

27   prior.

28        Moreover, Pringle explains that, although the 2019 and 2020 denials were not temporally

1  proximate to the December 12, 2018 OCR Complaint, his employer found the opportunity to

2  retaliate against him whenever he requested leave.  The Ninth Circuit has previously found that

3  delay between a plaintiff's protected activities and the purported adverse actions do not preclude a

4  finding of causation when the alleged retaliator does not have an opportunity to retaliate sooner.

5  *Porter*, 419 F.3d at 888–89 (protected activity was approximately two years prior to alleged

6  adverse employment action, but a triable issue existed because the adverse employment action was

7  the first opportunity to retaliate).

8      In sum, the facts alleged in the SAC plausibly demonstrate both temporal proximity

9  between Pringle's protected activities and the alleged adverse employment actions, as well as his

10 supervisors' actual knowledge of his protected activities.  Reading the SAC as a whole, he also

11 plausibly pleads a pattern of discriminatory and retaliatory activity over the last five years, during

12 which he made multiple complaints of discrimination and retaliation.  These allegations make the

13 inference of causation plausible.

14          **2.      "Pre-Disciplinary" Hearings as Adverse Employment Action**

15     Wheeler alternatively argues that Pringle's retaliation claim should be dismissed to the

16 extent that it relies on pre-disciplinary hearings because a pre-disciplinary hearing is not an

17 adverse employment action.  MTD 24.  This contention is outside the scope of a motion to

18 dismiss.  The Ninth Circuit has "found that a wide array of disadvantageous changes in the

19 workplace constitute adverse employment actions," but determining whether a particular action is

20 "reasonably likely to deter the charging party or others form engaging in protected activity" is a

21 fact-intensive question.  *Ray*, 217 F.3d at 1240; *see Prouty v. Berryhill*, No. CV1808567PAJPRX,

22 2019 WL 8164378, at *3 (C.D. Cal. Oct. 28, 2019) (plaintiff sufficiently pleaded discrimination,

23 retaliation and hostile work environment; whether defendant's alleged action "actually rises to the

24 level that warrants a ruling in Plaintiff's favor" is an "issue[] that must remain unresolved at this

25 stage of the litigation"); *Macieyovski v. City & Cty. of Denver, Dep't of Gen. Servs.*, No. 13-CV-

26 01186-WYD-BNB, 2015 WL 1509503, at *4–5 (D. Colo. Mar. 30, 2015) (denying summary

27 judgment on discrimination and retaliation claims because there were genuine issues of material

28 fact regarding whether written reprimand, transfer, change of schedule, and performance

23

improvement plan were considered adverse employment actions).

Altogether, Pringle sufficiently alleges all three elements of his retaliation claim. Wheeler's motion to dismiss the retaliation claim for failure to state a claim is DENIED.

### CONCLUSION

For the foregoing reasons, Wheeler's motion to dismiss the SAC is DENIED.

**IT IS SO ORDERED.**

Dated: August 12, 2020



William H. Orrick
United States District Judge